German *v.* McKeesport City (et al., Appellants).

42

Argued May 3, 1939.

Before Keller, P. J., Cunningham, Baldrige, Stadtfeld, Parker, Rhodes and Hirt, JJ.

*Lawrence D. Blair,* with him *Moorhead & Knox,* for appellants.

*William H. Coleman,* with him *Harry H. Meizlik,* for appellee.

OPINION BY KELLER, P. J., September 27, 1939:

Mrs. Maude German brought an action in trespass against the City of McKeesport for personal injuries sustained by her because of a fall, which she alleged was due to the defective condition of a sidewalk in that city. By scire facias proceedings the city brought in as additional defendants the owners of the building fronting on the alleged defective sidewalk. A verdict was rendered in favor of the plaintiff against the city, with liability in its favor over against the property owners. From the judgment entered on the verdict, the additional defendants, the property owners, have appealed, and ask for judgment in their favor notwithstanding the verdict.

As the verdict was for the plaintiff we shall have to resolve all disputed questions of fact and inferences of fact reasonably to be drawn therefrom in her favor. We shall, therefore, state the facts in the light most favorable to the plaintiff as detailed by her witnesses.

The appellants own a building in McKeesport at the corner of Fifth Avenue and Locust Street, a much traveled business district, numbered 400 Fifth Avenue. A storeroom at the corner is occupied by Federal Baking Company, with a door at the corner opening on both streets. The sidewalks on both streets are ten feet wide and of cement. On Saturday afternoon, March 30, 1935, between four and four-thirty o'clock of a dry, clear day, the plaintiff came out the corner door of the bakery and walked in a catercornered or diagonal direction across the sidewalk on Locust Street, with the intention of crossing the street at a point fifteen feet south of the south curb of Fifth Avenue—

not at the regular crossing place. She had her arms filled with bundles and the sidewalk was well traveled by pedestrians. As she got to the curb and was going to make the step down, her heel caught in something and she fell or was thrown into the street and was injured. When she was picked up she looked to see what had caused her to fall and found her heel print in the dirt or earth which had filled up even a break, imperfection or irregularity in the sidewalk just at the curb. She wore shoes with 'Cuban' heels[1] and the heel made a print somewhat like a shield or horseshoe, one inch and an eighth at its longest point and one inch and an eighth at its widest point. The curb was protected by an iron or steel band over the top, which extended partly down the street side. At its junction with the sidewalk there was an irregular break or imperfection in the surface of the sidewalk from fourteen to sixteen inches long and from one to three inches wide, which was apparently due to the cement top dressing having chipped or cracked off. At the point of plaintiff's heel mark this irregularity was two inches *wide,* and an examination made by her brother-in-law with his little finger showed that it was *"close to an inch" deep* before solid concrete was reached. The space had been filled up with earth or dirt "so that it was on the same level with the curb and the rest of the sidewalk" (66a) and was much the same color as the sidewalk and curb. No hole or fill appeared there to the casual observer. As the plaintiff said, "I looked down and there was no defect apparent (p. 26a) ...... There was no hole there until my heel sank in" (p. 39a). Her sister-in-law said: "I looked down to see where her heel came from and you could see where her heel had sunk in the mud. I would say the strip was 15 or 16 inches long

---

[1] Had plaintiff worn narrower French heels, there could have been no possibility of recovery: *Calligan v. Monongahela City,* 272 Pa. 28, 30, 115 A. 869; *Yearsley v. American Stores Co.,* 97 Pa. Superior Ct. 275.

and probably at the widest part in the sidewalk it was three and a half inches but it narrowed down and, of course, we crossed at the lower end. Where her foot caught probably wasn't more than a couple inches and it appeared to be solid. It looked the same as cement where her heel went down. Q. Would you be able to tell us, Miss German—assuming this was the sidewalk, would you be able to tell us what kind of a curb there was there at that time? A. I don't know whether it was steel or brass, but it was not a cement curb. It was a steel rod, I think, and then there was a little mud where the cement had been chipped or broken out and then the cement was ragged, you know, where her heel would lodge and it just threw her (47a, 48a) ...... Q. Did you examine as to what the defect in the sidewalk was at the time? A. Yes. Q. Tell the court and jury what you found? A. You would not have noticed it. I know she didn't notice it and I didn't notice it because it was practically the same color as the cement walk. That cement walk, as you could see, is very old. It is not light gray like it once was. It was very brown but where her heel stuck down in the mud was black underneath and as they swept the sidewalk off the dirt covered it up. (49a, 50a) ...... Q. Just what you saw and not the reasons. Does that picture show the place clearly? A. Yes, that is a good picture. Q. It is a good picture of the conditions as they were that afternoon? A. Yes, sir. Q. Was it raining? A. It had rained the day before. It had not rained that day. Q. It was broad daylight? A. Yes." (57a). While reference was made by some of the witnesses to 'mud', it was rather soft earth or dirt, than the consistency of mud. It was solid in appearance.

A photograph was offered in evidence, a copy of which appears in the record, which the witnesses for plaintiff all said was a good reproduction of the sidewalk at the time; and the condition of the sidewalk as

there shown, several witnesses said, had existed for about a year.

This action was brought by the plaintiff against the City and the verdict in her favor was against the City. She relied upon constructive notice of the alleged defect, for none other was alleged or proved. "Before a municipality may be charged with constructive notice of the existence of a defect, [in a sidewalk] it must appear that the dangerous condition is apparent upon reasonable inspection": *Good v. City of Phila. et al.,* 335 Pa. 13, 6 A. 2d 101, 102. In *Emery v. Pittsburgh,* 275 Pa. 551, it is said (p. 553) : "A municipality can be charged with a constructive notice of a defect in a sidewalk only when it is of such character as to be generally observable by pedestrians, that is, such as could and naturally would be seen by people using the walk: *Rosevere v. Osceola Mills Boro.,* 169 Pa. 555, 563; *Burns v. Bradford City,* 137 Pa. 361; *New Castle v. Kurtz,* 210 Pa. 183, 188; *Lohr v. Philipsburg Boro.,* 156 Pa. 246." This means that the dangerous condition must be such as to be observed and apprehended by the ordinary pedestrian. If it is of a nature to require very close examination before its dangerous character appears the municipality is not chargeable with constructive notice of it.

In *Malone v. Union Paving Co.,* 306 Pa. 111, 116, 117, 159 A. 21, the Supreme Court, speaking through Mr. Justice SIMPSON, said: "The municipality was not required to assume that a defect existed, or 'to seek for defects ...... The law only requires that it shall be vigilant to *observe* them when they become observable to an officer exercising reasonable supervision': *Lohr v. Philipsburg Boro.,* 156 Pa. 246, 249. That it was not observable in the instant case is evident from the fact that the plaintiff herself did not see it, though she says she carefully looked. If it was observable, and she chose to proceed notwithstanding, she was guilty of contributory negligence and cannot recover. If it was not ob-

servable to her, its condition was not such as to charge the city with constructive notice, and hence no recovery could be had against it on that ground. *Landis v. Phila., 295 Pa. 227.*"

"Whether there is sufficient evidence to sustain a finding that a defect is so notorious that notice may be implied is generally a question for the jury; that is, a defect that could be noticed by reasonable inspection; but where it is plain from the plaintiff's evidence that the defect is one that could be observed only by a very close examination, this standard of care would impose too harsh a rule and cause a municipality to be an insurer of the safety of pedestrians, and in such case it becomes the duty of the court to pass on the question of notice as a matter of law ...... Where the defect is only observable by exacting a high degree of care from the municipality the length of time that such defect has existed becomes immaterial." *Green v. Phila.,* 63 Pa. Superior Ct. 121, 123-124.

Even before the scire facias act of April 10, 1929, P. L. 479, and its amendments, which authorize a defendant to bring upon the record as additional defendants persons alleged by him to be liable over to him for the cause of action declared upon or jointly or severally liable therefor with him, etc., these appellants, if notified of the action and called upon by the city to defend it, would have had a right to appear and defend the action and to appeal from a judgment against the city; and this right of appeal would not be defeated by the city's failure to appeal, or, even, by the city's action in paying and satisfying the judgment: *Fowler v. Jersey Shore Borough,* 17 Pa. Superior Ct. 366. And that case is authority for the proposition that such an appellant, in the right of the city, can present any defense which the city could and might have relied on in the action. The case is different where the plaintiff recovers a judgment in his or her right against the additional defendant

as owner of the premises. That was not sought or obtained in this action.

We are of opinion that, from the evidence of plaintiff's own witnesses, the defect in the sidewalk was not one that an officer exercising reasonable supervision would consider dangerous to pedestrians, such as to require the city after a reasonable time to fix or repair it, with the alternative of liability if it failed to do so.

But in the circumstances of this case we go further, and hold that it was not such a defect in the sidewalk as imposed liability on the property owner for failure to remedy or repair it.

The law does not require that sidewalks shall be as free of defects, imperfections, irregularities, unevennesses, etc., as the floors of buildings. A reasonably safe condition is all that is necessary. Our climate, with its rain and snow, freezing and melting, frost and thaw, with their effects on exposed surfaces, including sidewalks, makes impossible the perfection of evenness to be expected in buildings and covered places. The roots of trees planted along sidewalks—there were none in this instance, it is true—cause irregularities which, however, do not require remedying or repair until the break or imperfection is so great as to be patently dangerous. Such irregularities and unevennesses are especially frequent and likely to occur where the sidewalk and curb join or abut, by reason of the curb loosening or separating from the sidewalk and the accumulation of dampness there; but to impose liability on the property owner or the city they must be so large and unusual as to appear dangerous to the ordinary pedestrian and everyday passerby. A difference or discrepancy of an inch and a half between the levels of two abutting curbstones was held not to impose liability: *McGlinn v. Phila.*, 322 Pa. 478, 186 A. 747. And such a variation —1½ inches—between the adjoining ends of flagstones in a street crossing is not evidence of negligence imposing liability for injuries to a pedestrian who fell at

that point: *Newell v. Pittsburgh,* 279 Pa. 202, 123 A. 768. In *Calligan v. Monongahela City,* 272 Pa. 28, 115 A. 869, where recovery was allowed to a plaintiff whose heel was caught in the hole left in a sidewalk by the removal of several discs of glass from a framework, through which light entered a room or vault under the sidewalk, Mr. Justice SIMPSON, speaking for the court, said: "We do not qualify our oft-repeated rulings in the case of inequalities in a pavement, caused by wear and tear or the actions of the elements;" from which we have a right to infer that in those classes of cases there is no liability except where the inequality is so great as to be patently dangerous. See also: *Burns v. City of Pittsburgh,* 320 Pa. 92, 96, 181 A. 487; *Mason v. Phila.,* 205 Pa. 177, 54 A. 773; *King v. Thompson,* 87 Pa. 365, 370; *Reed v. Tarentum Boro,* 213 Pa. 357, 358, 62 A. 928; *Purcell v. Riebe,* 227 Pa. 503, 505, 76 A. 212; *Morris v. Phila.,* 195 Pa. 372, 45 A. 1068; *Canavan v. Oil City,* 183 Pa. 611, 38 A. 1096; *Burns v. City of Bradford,* 137 Pa. 361, 367, 20 A. 997.

In *Boyd v. Kensington Water Co.,* 316 Pa. 522, 175 A. 395, a woman tripped over a water box raised five or six inches above the ground or grass plot between the curb and the sidewalk, which latter was only three feet seven inches wide, and the Supreme Court upheld judgment for the defendant notwithstanding the verdict for the plaintiff. In *Foster v. West View Boro et al.,* 328 Pa. 368, 370, 195 A. 82, the sidewalk was only four feet wide and an uneven, rough and unpaved strip two feet wide was left between the sidewalk and the curb, from two to four inches lower than the level of the sidewalk. The plaintiff at night, in order to make room for a child to pass, stepped off the sidewalk to the unpaved portion and fell. The Supreme Court sustained the refusal of the court below to take off judgment of nonsuit. The pavement or sidewalk in the present case was ten feet wide. The defect or imperfection was right at the curb, and where the plaintiff fell it was only two inches wide

and close to an inch deep. Not one pedestrian in a thousand would have any call to be there; in fact, no one except a person who crossed the street at this point, about fifteen feet from the regular crossing, could be affected by it; and to the ordinary observer and pedestrian, whether filled up or not, it presented no aspect of danger. On a Saturday following the argument of this appeal, the writer of this opinion walked from the Schenley Hotel down Fifth Avenue to the Court House on Grant Street, in the City of Pittsburgh, a distance of about two and three-quarter miles, and counted the imperfections and inequalities in the sidewalks traversed by him, which were at least as great as that testified to in this case and shown in the photograph in the record, and he counted five hundred of them before he got to Grant Street, and then stopped counting. To impose a burden of liability on either municipality or property owner for an imperfection as common and usual as that relied on to create liability in this case would put an intolerable burden on the property owner and the city and encourage carelessness by pedestrians in the use of city streets. There are certain reasonable risks that every person who uses city streets must assume as inconveniences to be set off against the advantages of city life, *(Morris v. Phila.,* supra), and this case presents one of them.

The judgment is reversed and is now entered in favor of the appellants.